UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

   Plaintiff,

v.  Case No.: 8:22 cv 2332 SDM-AAS

PHOENIX MEDICAL MANAGEMENT   EX PARTE/FILED
CARE CENTERS, INC., PATRICIA   UNDER SEAL
FERGUSON, CHRISTOPHER P.
FERGUSON; VIVIAN HERRERO, M.D.;   TIME-SENSITIVE

   Defendants.
_____/

# EMERGENCY MOTION FOR A TEMPORAY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Under Rule 65, Federal Rules of Civil Procedure, and Local Rule 6.01, the United States moves *ex parte* for a temporary restraining order and preliminary injunction.

## I. INTRODUCTION

Phoenix Medical Management Care Centers, Inc., ("Phoenix") is a pill mill disguised as a charity with a convicted drug trafficker as a proprietor and a pediatrician as a prescriber. The pediatrician, Dr. Vivian Herrero, writes prescriptions to adults for high doses of opioids and other controlled substances in dangerous combinations without independently evaluating a patient's basis for

1

receiving those prescriptions as required by Florida law.[1] The proprietor, Christopher Ferguson, and the owner, Patricia Ferguson, set up their cash-only clinic for the specific purpose of illegally distributing controlled substances. The Fergusons and Dr. Herrero continue to facilitate the illegal distribution of controlled substances through Phoenix under the guise of pain management.

For the reasons described in this motion, the Court should enjoin the defendants from continuing to operate a business or supervise others involved in the distribution of controlled substances, through the issuance of prescriptions or otherwise, pending a final judgment in this case.

## II. FACTUAL BASIS

### A. Phoenix, the Fergusons, and Dr. Herrero

The factual basis for a temporary restraining order and preliminary injunction is described in the sworn declarations of Drug Enforcement Administration ("DEA") Diversion Investigator Mark Biondolino, **Exhibit A**; DEA Special Agent Joseph Pelz, **Exhibit B**; and medical expert Dr. Paul Lynch, **Exhibit C**.

### B. Persons and conduct subject to restraint.

This motion seeks to temporarily and preliminarily restrain the defendants by prohibiting them from (1) administering, dispensing, or distributing controlled substances, as those terms are defined in the Controlled Substances Act, 21 U.S.C. § 802, including prescribing any controlled substance; (2) applying for or seeking

---

[1] Fla. Stat. § 456.44.

renewal of a DEA certificate of registration on behalf of themselves or any legal entity; and (3) prohibiting their managing, controlling, operating, or working for any legal entity that dispenses, distributes, or administers controlled substances.

### C. Security

Under Rule 65(c), "[t]he United States, its officers, and its agencies are not required to give security."

## II. MEMORANDUM OF LAW

### A. The Controlled Substances Act

#### i. The purpose is to protect the health and welfare of Americans.

The Comprehensive Drug Abuse Prevention and Control Act of 1970, otherwise known as the Controlled Substances Act, 21 U.S.C. § 801, et seq., (the "CSA") regulates the manufacture, import, possession, use, and distribution of certain substances. Those substances reside on one of five schedules depending on the potential for abuse, the accepted medical use in treatment in the United States, and the consequence of abuse. 21 U.S.C. § 812. Congress enacted the statute in part because "the illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a detrimental effect on the health and welfare of the American people." 21 U.S.C. § 801.

The CSA requires those who dispense or distribute controlled substances to obtain a registration from the DEA. 21 U.S.C. §§ 802(10), (21), 822(a). A DEA registration, however, is not a blank check. Rather, a registrant may act only "to the extent authorized by the[] registration and in conformity with the" CSA. 21 U.S.C.

§ 822(b). For a physician, the CSA "limit[s] a registered physician's dispensing authority to the usual course of his 'professional practice.'" *United States v. Moore*, 423 U.S. 122, 140 (1975). The CSA also constrains non-registrants, such as a pain clinic, that maintains a drug-involved premises. 21 U.S.C. § 856. All are subject to restraint from further violations.

    ii.  **The CSA provides for an injunction.**

Section 843(f) of the CSA authorizes the Attorney General to sue for an injunction related to violations of Sections 842, 843, or 856 of Title 21, and Section 882 provides United States District Courts jurisdiction to enjoin any violation of Subchapter I. "The court shall proceed as soon as practicable to the hearing and determination" of an action for an injunction. 21 U.S.C. § 843(f). CSA precedent supports enjoining registrants and non-registrants who violated the CSA and limiting their ability to further deal in controlled substances. *United States v. Esalomi*, Case No. 8:22-cv-1725-TPB-JSS (M.D. Fla. Aug. 2, 2022); *United States v. Uppal*, Case No. 8:22-cv-1622-TPB-JSS (M.D. Fla. July 18, 2022); *United States v. WeCare Pharmacy et al.*, Case No. 8:21-cv-188-MSS-AEP (M.D. Fla. Jan. 26, 2021); *United States v. Oakley Pharmacy et al.*, Case No. 2:19-cv-0009, Doc. 10 (M.D. Tenn. Feb. 21, 2019); *United States v. Gerber*, Case No. 3:18-cv-1908, Doc. 12) (N.D. Ohio Aug. 30, 2018); *United States v. Salcedo*, 2003 WL 21196843, *3 (E.D.N.Y. Feb. 19, 2003); *Advance Pharmaceutical v. United States*, 391 F.3d 377, 389-90, 400 (2d Cir. 2004).

### B. The United States satisfies the requirements of Rule 65 and LR 6.01.

Rule 65(b), Federal Rules of Civil Procedure, permits a temporary restraining order without notice to the adverse party if "immediate and irreparable injury, loss, or damage will result . . . before the adverse party can be heard in opposition" and if the movant's attorney certifies efforts to provide notice or reasons why notice should not be required.

Rule 65(a), Federal Rules of Civil Procedure, permits a preliminary injunction on notice to the adverse party. The purpose of a preliminary injunction "is to protect against irreparable injury and preserve the status quo until the district court renders a meaningful decision on the merits." *Schiavo ex rel. Schindler v. Schiavo*, 357 F. Supp. 2d 1378, 1383 (M.D. Fla. 2005). The movant must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

#### i. The United States has a substantial likelihood of success on its claims under 21 U.S.C. § 842(a)(1).

"A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success." *Schiavo*, 357 F. Supp. 2d at 1383. Here, the United States has a substantial likelihood of success on the claim under 21 U.S.C. § 842(a)(1) that Dr. Herrero violated the CSA by issuing controlled substance prescriptions outside the usual course of professional practice and not for a legitimate

5

medical purpose. Registered physicians may dispense[2] controlled substances, but only consistent with the requirements of 21 U.S.C. § 829. Section 842(a)(1) prohibits violations of Section 829 and imposes a civil penalty for each violation as described in Section 842(c)(1)(A). Specifically, Section 842(a)(1) says:

> **(a) Unlawful acts**
> It shall be unlawful for any person—
> (1) who is subject to the requirements of Part C to distribute or dispense a controlled substance in violation of section 829 of this title[.]

Title 21, Part 1306, Code of Federal Regulations, sets forth the prescription requirements under Section 829 applicable to issuing and filling prescriptions. 21 C.F.R. § 1306.01. Section 1306.04 defines a valid prescription for purposes of Title 21 as one that is issued for a legitimate medical purpose by a practitioner acting in the usual course of professional practice. Whether a physician issued a prescription for a legitimate medical purpose in the usual course of professional practice requires determining whether the physician acted "'in accord[] with a generally-accepted standard of medical practice.'" *Ruan v. United States*, 142 S. Ct. 2370, 2382 (2022) (explaining that this is an objective standard); *United States v. Enmon*, 686 F. App'x 769, 772 (11th Cir. 2017) (quoting *United States v. Merrill*, 513 F.3d 1293, 1306 (11th Cir. 2008)); *United States v. Joseph*, 709 F.3d 1082, 1097 (11th Cir. 2013). The CSA

---

[2] "Dispense" means "to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for such delivery." 21 U.S.C. § 802. The issuance of a prescription for a controlled substance is the constructive transfer, i.e., delivery, of a controlled substance. *Id.*

6

leaves the states to define the standards of professional practice. *United States v. Tobin*, 676 F3d 1264, 1275-76 (11th Cir. 2012), abrogated on other grounds by *United States v. Davila*, 569 U.S. 597, 610 (2013).

In Florida, the "prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." Fla. Stat. § 766.102. A physician who prescribes a controlled substance in Schedules II through IV must abide certain minimum standards of practice for controlled substances prescribing. Fla. Stat. § 456.44(2)-(3). A physician must also check a patient's PDMP report before prescribing a controlled substance. Fla. Stat. § 893.055(8).

As explained in the Declarations of Mark Biondolino and Dr. Paul Lynch, Dr. Herrero is a pediatrician who admits that she went to work at Phoenix because she needed the money. Ex. A, ¶ 20, Ex. C. Dr. Herrero has no specialized medical training or board certifications in the treatment of adults with chronic pain or addiction. Ex. A, ¶ 19. When a physician like Dr. Herrero treats patients or prescribes drugs in a manner so clearly outside of the physician's specialty, the physician is very likely issuing prescriptions outside the usual course of professional medical practice and not for a legitimate need. *See, e.g., United States v. Hubbard*, 2017 WL 1503996, *5 (E.D.K.Y. April 26, 2017) (evidence showing a prescription was not for a legitimate medical need included the fact that the physicians prescribing oxycodone did not specialize in pain management—one was a gynecologist and

7

another was a pediatrician); *United States v. Darji*, 609 F. App'x 320 (6th Cir. 2015) (evidence showing that prescriptions were not legitimate included that the prescribing physician was a psychiatrist, who should not have been seeing patients for chronic pain conditions); *United States v. Sabean*, 885 F.3d 27, 47 n. 6 (1st Cir. 2018) (noting expert testimony that a dermatologist lacks the necessary qualifications to write prescriptions for anti-anxiety and anti-depressants on a long-term basis).

Dr. Lynch's declaration further explains how Dr. Herrero's prescribing fell far below the minimum standards of professional practice under Florida law, as well as the generally accepted standard of medical practice for physicians prescribing opioids in the treatment of chronic pain. Ex. C. Dr. Lynch concludes that Dr. Herrero prescribed exceedingly high doses of opioids without supporting pathology or diagnoses, prescribed dangerous combinations of opioids and benzodiazepines, and disregarded numerous and obvious warning signs of misuse and abuse in her patients. Dr. Lynch also found that Dr. Herrero acted outside the standard of care when (1) she relied on the diagnoses of other providers rather than conducting her own examination and diagnosis and (2) she delegated to the clinic's administrator her responsibility for ordering and reviewing urine drug tests and for deciding when to discontinue treatment with controlled substances. Ex. C. In sum, in a number of ways while writing controlled substance prescriptions, Dr. Herrero was not acting like a legitimate doctor or actually practicing medicine. Based on this evidence, the United States is likely to succeed on the claim that Dr. Herrero issued controlled substances not for a legitimate medical purpose or outside the usual course of

professional practice.

> ii. **The United States has a substantial likelihood of success on its claims under 21 U.S.C. § 856(a).**

Here, the United States has a substantial likelihood of success on the claim that the Fergusons and Phoenix operate drug involve premises.

Under Section 856(a)(1) of Title 21 a person cannot "knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance." In other words, "the statute makes it a crime for a person to use any place—it does not have to be a place the person manages or controls—for the purpose of manufacturing, distributing, or using drugs." *United States v. Plotka*, 438 F. Supp. 3d 1310, 1316 (N.D. Ala. 2020). Under Section 856(a)(1), "the person must have the purpose of manufacturing, distributing, or using drugs at the place; '[i]t is not sufficient that others possess the requisite purpose.'" *Plotka*, 438 F. Supp. 3d at 1316 (quoting *United States v. Clavis*, 956 F.2d 1079, 1090 (11th Cir. 1992)).

A medical clinic and its owners are susceptible to prosecution under Section 856(a)(1). For example, the United States charged a physician criminally under Section 856(a)(1) for operating his medical practice as a pill mill, i.e., with the purpose of illegally distributing controlled substances. *United States v. Nasher-Alneam*, 399 F. Supp. 3d 561, 565 (S.D. W.Va. 2019). The district court explained that "[t]he government does not have to prove that illegal drug dealing was the sole purpose for which Dr. Nasher maintained his medical practice. However, it must prove . . . that

illegal drug dealing was a primary or principal reason the defendant maintained his medical practice." *Id.* Evidence relevant to this charge included patient medical records and testimony; testimony from pharmacists, medical experts, former employees, and law enforcement; data from the prescription drug monitoring program ("PDMP") for all prescriptions written by the physician; and evidence showing "'mass-produced features of patient charts, the remarkable similarity of the regimen of drugs prescribed and dispense[d] to the clinic clients, and the character of the clientele as described by neighboring tenants and by pharmacists who refused to fill their prescriptions.'" *Id.* at 567-68 (collecting cases and quoting *United States v. Sadler*, 2021 WL 3527084, 5 (S.D. Ohio Aug. 15, 2012)).

By contrast, Section 856(a)(2) requires that the person "manage or control" the place at issue but "'does not require the person who makes the place available to others for drug activity to possess the purpose of' manufacturing, storing, distributing, or using drugs." *Plotka*, 438 F. Supp. 3d at 1316 (quoting *United States v. Chen*, 913 F.2d 183, 1919 (5th Cir. 1990)). Rather, Section 856(a)(2) applies "to the person who may not have actually opened or maintained the place for the purpose of drug activity, but who has knowingly allowed others to engage in those activities.'" *Id.* "That is, the person knowingly allowed others who had the requisite purpose to use the place." *Id.*; *United States v. Tebeau*, 713 F.3d 955, 959-60 (8th Cir. 2013).[3]

---

[3] An act is done knowingly "if done voluntarily and intentionally, and not because of mistake or accident . . ." *United States v. Daughtry*, No. 1:20-CV-00305, 2020 WL 6379234, at *5 (E.D. Tex. Sept. 9, 2020); Eleventh Circuit Court of Appeals Pattern Jury Instructions

For example, in *Plotka*, the United States charged a physician criminally under Section 856(a)(2) and alleged that he allowed others to use drugs at his house. 438 F. Supp. 3d at 1313. Specifically, Dr. Plotka allowed young women, some of whom he hired as prostitutes, to live at his house where they used illicit drugs. Dr. Plotka gave them money for drugs and kept syringes at the house for intravenous drug use. *Id.* at 1314. On a motion to dismiss by Dr. Plotka, the district court held that, based on the factual allegations in the indictment, Dr. Plotka could be charged under Section 856(a)(2) for facilitating drug use at his house. *Id.* at 1315.

In this case, the United States has a substantial likelihood of success under both Sections 856(a)(1) and 856(a)(2). By falsely claiming to be a charity, the Fergusons removed Phoenix from some of the legal requirements designed to assure legitimate controlled substance prescribing, such as physician ownership and physician pain management training and experience requirements. Fla. Stat. §§ 458.3265(1)(a)(2); Fla. Admin. Code. § 64B8-9.0131. This corporate form was calculated by the Fergusons to advance an illegal controlled substance distribution scheme in which the Fergusons recruited doctors who had little or no experience or medical training in managing chronic pain, who were willing to limit their roles in patient care, and who were promised little work and lots of money to write prescriptions. Under what Chris Ferguson described as "continuity of care,"

---

(Criminal Cases), Instruction B9.1A. Both knowledge and specific intent may be inferred from the circumstances. *McCray v. United States*, 815 F. App'x 459, 461 (11th Cir. 2020).

Phoenix's doctors could, in exchange for cash, write prescriptions for patients at Phoenix without conducting a physical examination or diagnosing a painful condition, without ordering or reviewing diagnostic tests such as urine drug screens, and often without even seeing the patient (but all the time receiving an office visit fee). Under this model, Dr. Herrero and others would write prescriptions without engaging in the essential attributes of being a doctor. Predictably, these prescriptions had the added feature of being egregiously outside the standard of care. Thus, the United States likely will succeed in showing that the defendants maintained Phoenix for the purpose of illegally distributing controlled substances.

### iii. The threat of imminent, irreparable harm exists in the form of addiction, overdoses, and death.

The defendants' conduct has caused, and will continue to cause, irreparable harm for which the United States lacks an "adequate remedy at law, meaning that its injury 'cannot be undone through monetary remedies.'" *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 117 F. Supp. 2d 1322, 1330 (M.D. Fla. 2000) (quoting *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987)).

Irreparable harm "must be neither remote nor speculative, but actual and imminent." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Death and bodily harm are quintessential forms of irreparable harm. *See Schiavo*, 357 F. Supp. 2d at 1383; *Planned Parenthood Southeast, Inc. v. Bentley*, 951 F. Supp. 2d 1280, 1289 (M.D. Ala. 2013); *Jones "El v. Berge*, 164 F. Supp. 2d 1096, 1123 (W.D. Wisc. 2001); *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 19-20 (D.D.C., 2005).

In this case, an imminent threat of irreparable harm exists if the defendants can continue dealing in controlled substances pending a final judgment. Opioids are highly addictive, often abused, and can cause a patient to overdose and die. Dr. Herrero is a dangerous prescriber who, if allowed to continue dealing in controlled substances pending a final judgment, may facilitate further patient addiction and overdoses. The Fergusons support and facilitate the conduct of Dr. Herrero and other physicians employed by Phoenix. This situation threatens irreparable harm to the citizens of this community.

### iii. The threatened injury to patients outweighs the potential harm to the defendant.

The risk of serious physical harm or death resulting from the defendants' unlawful conduct indisputably outweighs the potential harm to them and to others.

Legitimate pain management treatment requires practitioner training, skill, and attention not available at Phoenix. Although an injunction against the defendants' dealing in controlled substances could impact earnest patients who may validly need prescriptions, "there is a weighty public interest in preventing the illegal diversion of prescription drugs, particularly in light of the rampant and deadly problem of prescription drug abuse[.]" *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 230 (D.D.C. 2012). Enjoining the defendants' unlawful conduct would also accomplish the social good of prompting any sincere pain patients to obtain treatment from other providers where they could have greater confidence in their medical treatment. Plenty of other physicians practice throughout the Tampa Bay

region, and therefore any legitimate need can be satisfied by a trained pain management physician at a different clinic.

Furthermore, Dr. Herrero can continue to see patients, to practice medicine, to make referrals, and to engage or recommend any of the many non-controlled-substance therapies for treating any variety of conditions. She will simply lack, temporarily, the ability to prescribe controlled substances while the legal process to evaluate her prescribing practices is pending. She cannot complain that an injunction will put her out of business because she "can have no vested interest in a business activity found to be illegal." *United States v. Diapulse Corp. of Am.*, 457 F.2d 25, 29 (2d Cir. 1972). The prescriptions identified in this motion are just that. In any event, the United States trusted Dr. Herrero "to be [a] conscientious gatekeeper[] to these dangerous and potentially fatal drugs." *United States v. Garrison*, 888 F.3d 1057, 1059 (9th Cir. 2018). She betrayed that trust and abused the privilege of her prescription pad.

As for the Fergusons and Phoenix, any legitimate patients of the clinic can go elsewhere for care. The Fergusons are also free to engage in any other business that does not involve the dispensing, distributing, or administering of controlled substances. Patty Ferguson could operate Phoenix as a non-profit primary care clinic consistent with her representations to the IRS, *see* Ex. A, Att. 3, and engage physicians or other medical professionals to provide any kind of care not involving controlled substances.

### iv.   An injunction comports with the public interest.

The public interest favors an injunction. While a pandemic of historic proportions gripped the world's attention and resources, the scourge of opioid addiction continued and, in terms of overdose deaths, worsened.[4] Physicians are the front line in this public health crisis. When a physician abuses her authority, she should not be allowed to perpetuate that abuse during the pendency of the legal process. By limiting dispensing authority to prescriptions issued in the usual course of professional practice, the CSA carries "an implied finding [by Congress] that violations will harm the public and ought, if necessary, be restrained." *United States v. Diapulse Corp. of Am.*, 457 F.2d 25, 28 (2d Cir. 1972). The United States therefore has "a strong interest in enforcing the CSA and ensuring that pharmaceutical drugs are not improperly diverted" while proceedings against a registrant are pending. *Cardinal Health*, 846 F. Supp. 2d at 230.

Similarly, the public interest favors an injunction against a clinic, as well as its owners and operators, who purposefully engage in the illegal distribution of controlled substances.

### v.   The United States faces irreparable harm, loss, or damage if notice is given to the defendant.

Rule 65 permits a court to issue a temporary restraining order without notice only if "specific facts ... clearly show that immediate and irreparable injury, loss, or damage

---

[4] *See* "The Opioid Epidemic During the COVID-19 Pandemic," available at https://jamanetwork.com/journals/jama/fullarticle/2770985 (last visited Oct. 4, 2022).

will result to the movant." Fed. R. Civ. P. 65(b)(l)(A). As explained above, to demonstrate irreparable harm, the United States must lack an "adequate remedy at law, meaning that its injury 'cannot be undone through monetary remedies.'" *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 117 F. Supp. 2d 1322, 1330 (M.D. Fla. 2000) (quoting *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987).

A temporary restraining order without prior notice is necessary here. Law enforcement plans to arrest Dr. Herrero as part of a parallel criminal investigation of her conduct at Phoenix and to conduct searches attendant to that investigation. Advance notice would provide Dr. Herrero an opportunity to conceal or destroy relevant evidence. Therefore, this motion should be granted without prior notice to the defendants. The defendants can be fully protected by prompt post-TRO notice and opportunity for a hearing, both of which can be required by the terms of the temporary restraining order itself and have in fact been incorporated into the proposed order submitted with this motion.

## IV. CONCLUSION

Accordingly, the United States respectfully requests a temporary restraining order in the form attached as **Exhibit D** to this motion.

Dated: October 12, 2022

Respectfully submitted,

| | |
|---|---|
| BRIAN M. BOYNTON<br>Principal Deputy Assistant Attorney General<br>Civil Division | ROGER B. HANDBERG<br>United States Attorney<br><br>/s/ Lindsay S. Griffin<br>LINDSAY SAXE GRIFFIN |
| ARUN G. RAO<br>Deputy Assistant Attorney General<br>Civil Division | Assistant United States Attorney<br>Florida Bar No. 72761<br>KELLEY HOWARD-ALLEN<br>Assistant United States Attorney |
| GUSTAV W. EYLER<br>Director, Consumer Protection Branch | Florida Bar No. 85464<br>400 North Tampa Street, Suite 3200<br>Tampa, FL 33602<br>Telephone No. (813) 274-6155 |
| /s/Scott B. Dahlquist<br>SCOTT B. DAHLQUIST<br>THOMAS S. ROSSO<br>Trial Attorneys<br>Consumer Protection Branch<br>U.S. Department of Justice<br>P.O. Box 386<br>Washington, D.C. 20044<br>Scott.B.Dahlquist@usdoj.gov<br>Thomas.S.Rosso@usdoj.gov<br>Telephone No. (202) 532-4602<br>Facsimile No. (202) 514-8742<br>*Attorneys for the United States* | Facsimile No. (813) 274-6200<br>Lindsay.Griffin@usdoj.gov<br>Kelley.Howard@usdoj.gov |